Ladies and gentlemen, please rise. The court is now in session. Please have a seat, folks. Good afternoon. The court can call the next case. 315-0057, In re. Marriage of Nakba Lori Ryali, F.A.A. Funding College, and C.S. DeWalt, Ex. Mr. Madden, if you're ready to proceed. May it please the court. My name is John Madden, counsel for Appellant Stewart Cingla. This appeal turns on whether a trial court may modify parenting time, deny contempt relief, award unilateral decision-making authority based on refused and unlawful evidence, and on actions that contravene the unambiguous language of the allocation judgment. The record shows four core errors. The trial court's reliance on denied 2015 and 2016 video recordings that were denied on the basis of relevance and would have also been denied on the basis of the eavesdropping statute. The trial court's consideration of secret audio recordings that are in violation of the eavesdropping statute. The denial and restriction of SUNY's parenting time without adequate grounds for a finding of serious endangerment. And Maddie's unilateral change of the child's school from public to private in violation of the plain language of the allocation judgment. Counsel, before you started on the video and audio tapes, didn't the court say that it wasn't considering them? It did say that it was not considering them, but in the course of its findings, it did consider them. It referenced specific lines that were from the audio recording. They made up the basis of their findings. So I don't know how you can untangle their ultimate order without being able to determine the degree at which they considered them, when clearly they considered them and they listed it as a basis of their credibility determination. And is that in Judge Lepofsky's oral or written ruling? It is in the written ruling. Thank you. Starting with the 2015 and 2016 videos, these stemmed from approximately nine years prior to the hearing. They stemmed from prior to the dissolution case. In the course of the dissolution case, they came to an agreed parenting plan. They modified that parenting plan in 2020. These recordings, these video recordings were always irrelevant to the litigation. They were seemingly introduced for the sole purpose of trying to portray Sunita as having some kind of anger issue. They were timely objected to on the basis of relevance in the eavesdropping statute. They were played for the court to be able to determine if they would be found admissible on the basis of relevance. And the court never got to the eavesdropping statute because on the basis of relevance, it denied those videos. How does this get in? They were denied. I know the court had a chance to look at them, but they were denied. You're just saying because they appeared in the ruling, he must consider them even though he said he didn't? Correct. He references Sunita yelling. A video was played to the court that showed that Sunita was screaming at the top of his lungs. So clearly he's using it as part of his assessment of the credibility of Sunita. They're referenced and the conversations contained in them were referenced. And they were used as a basis to determine that Sunita had anger issues. Sunita was never able to rebut the videos and explain why that takeaway was incorrect because he never should have had to do that. They were not in evidence. They were denied. I believe the court's ruling is against the manifest way that the evidence that the findings are unreasonable, arbitrary, not based on the evidence. Here, they are explicitly based on not evidence. So the inclusion of the videotapes, I believe, is reversible error. On the second issue regarding the GAL's second supplemental report, during the course of the trial, there was a phone call that took place between Sunita and his daughter, Rhea. Unbeknownst to either Sunita or Rhea, Madhavi secretly recorded that conversation. She provided that conversation to the GAL, and the GAL included a detailed summary of that in her second supplemental report. That second supplemental report was then submitted as evidence. It was timely objected to on the basis of the eavesdropping statute, but the court then allowed it into evidence. Here, I believe that the clear language of the eavesdropping statute and fears make clear that it's inadmissible in evidence. Sunita had a reasonable expectation of privacy. Both the parties were in their own home. Madhavi's own testimony was that neither party were aware she was recording it. It was recorded for the sole purpose of providing that information to a third party, and it was disclosed to a third party. And through the GAL's report, it got before the court, and it got admitted into evidence. The court's reliance on the GAL's report and its references directly thereto, saying that Sunita screamed the F word at his daughter during this conversation, is a direct excerpt from the GAL's report and is a direct link to that audio recording. There is no ability to wash improper evidence through a GAL's report. When it comes before the court, it is part of the evidence. There is no relevant exception. I believe the exception that's referenced by opposing party is the fear of— Let's assume you're correct, Counselor. If there's other evidence, though, let's say we have other independent evidence that came in beyond this, would it be okay to excise the evidence that you see as inappropriate and use the rest of the evidence that came in properly? I'm not sure that there's an easy way to do that. When they're all listed in the court's findings and in the court's ruling, it requires both the parties and now the appellate court to guess what way each element was put on. When it's included in the findings and it's a basis of what the judge ultimately determines, it has been considered, and it's hard for the court to determine— the appellate court now to determine what is or is not what the court ultimately relied on as far as each individual element of its determination. Regarding the recording, a violation of the eavesdropping statute requires the use of a secret device to record conversation, and then when the parties—without the consent of all the parties to private conversation and the use and disclosure of information they knew or reasonably should have known was obtained from a private conversation in violation of the statute. Here, Modity checks all the boxes. She wasn't a party. She recorded the conversation. She never got anyone's consent, and she disclosed the conversation to a third party, the GAO. I don't believe any exception applies herein. The reference exception from the other side was the fear of crime exception, but that requires to be made by a party of the conversation or at the direction of the party of the conversation, and here her own testimony directly contradicts that. Her testimony is that neither party were even aware she was recording. On the third element, I don't believe that there's anything to find that there's a standard— that has reached the standard of a serious endangerment, especially if you would excise the conversation and the video— the audio recording and the video conversation. No therapist testified. No reunification therapist testified. An emergency order of protection was obtained related to a broken light switch in 2021 and Sunit punching his steering wheel in 2022. As a result of that, Dr. Goldstein was appointed, and he provided his report, which would have had Sunit resuming overnight parenting time in February of 2023. Instead, Sunit has had no overnight parenting time since the emergency order was first entered in September of 2022. Prior to that, he had three overnights out of every seven days. He went from 43% of overnights to now zero, and since April of 2024, he has had no parenting time, period. Regarding the light switch incident, Montague made a prior DCFS complaint. It came back unfounded. Seemingly, in their ultimate trial, most of the arguments raised were things that took place during the course of the litigation. They claimed that the children were suffering in school, but these were issues at school that took place after Sunit's time was cut. The testimony at trial was that he would be there to help them with their homework. There's testimony that Rhea began using Prozac that started after Sunit's time was cut and was increased further while Sunit was having no parenting time. There was an emergency order of protection. They withdrew that emergency order of protection, but following that withdrawal of the emergency order of protection, Sunit's time did not go back to what it was previously. Instead, he was dealing with weekends with no overnight parenting time, and then unilaterally, Montague simply refused to allow him to exercise even that much time. Dr. Goldstein didn't see any reason to prevent overnight parenting time, and he's the only professional to render any opinion on Sunit after an actual evaluation. Dr. Goldstein also recommended we continue using joint decision-making. Instead, the court ultimately went with allowing Montague sole decision-making, which I believe is an error and not supported by the evidence. On the fourth issue, Montague enrolled the child, Lila, the younger child, into Vine Academy. The language of the allocation judgment specifically says that the parties are to continue to have the child in the school at which Montague resides, in the public school, and any change to private school requires the agreement of both parties. Any change to the school required the agreement of both parties. Montague wanted to change Lila's school in June of 2024, and asked Sunit to agree. Sunit said no. In July 2024, he simply changed the school. Montague admits she made the change without Sunit's approval and without motion before the trial court. The trial court's job is to analyze and apply the unambiguous language of the allocation judgment. It is not to use outside facts to determine whether or not a violation occurred. If Montague wanted to deviate from the allocation judgment, that would require going to court and petitioning to change the agreement. It does not allow Montague to make changes unilaterally and then simply ask for forgiveness afterwards. The private school that Montague is now sending Lila costs approximately $3,000 a month, which is split evenly between the parties, meaning that Sunit is now paying an additional $18,000 per year for something he never agreed to and which should not have been his expense because, according to the plain language of the allocation judgment, that would require the court to approve it. I believe each of these errors form the basis of a reversal. I'm asking the appellate court to reverse the trial court's judgment and remain the matter to the trial court with orders to exclude any reference to the 2015 and 2016 video, exclude any reference to the JL Second Supplemental Report and the audio recordings, and reverse the trial court's decision on the basis of the school issue because I do not believe that Sunit is responsible for that, and I believe that the child, according to the evidence that was presented, the child was doing fine in public school when he had adequate parenting time with Sunit. I believe that the ruling on the basis of parenting time should be reversed and should be reverted back to what's in the allocation judgment, and to get to that point, Dr. Goldstein provided a roadmap in which to start Dr. Singler's parenting time, but at this point, I believe he's probably owed significant make-up parenting time, as he has been without seeing his children for now 16, 17 months, since April of 2024, more than that, over 18 months now. So the initial allocation judgment, that was actually by agreement, right? It was, yes. And doesn't that presuppose that the parties will have an ability to get along and parent cooperatively? It does. An ongoing ability? It does. Does it look like they have that now? I would say that any issue that has arisen between the parties related to their ability to co-parent is not the problem of Sunit. These are issues that were raised over a broken light switch in 2021 and him saying a profanity while hitting his steering wheel, not at the children, just in the presence of the children in 2022. While there may be discrepancies between the parties in how they parent, it's not that the parties are necessarily in disagreement regarding what is in the best interest of these children. I think both parties should ideally want both parents to have parenting time. Of course. It doesn't always work that way. It doesn't, but I believe in this case, this is not one that would require the parties to have that kind of separation between them. I mean, the parities were able to maintain this parenting agreement between the entry of the allocation judgment through the modification in 2020, up until the date of the order of protection. So you're saying they were getting along until they weren't? Essentially, yes. You and I could get along until we're not. I mean, it's a pretty wonky standard, really. It is, but you have to, I believe, assess what is in the best interest of the children, not necessarily what is the easiest for either party. And I believe that it may be somewhat difficult for these parents to get along, but they were capable of doing it, and they should continue to go through the effort to continue to do it, because these children deserve to have their dad, and they benefit from having their dad with them. Thank you, Counsel. Your time is up, but let me see if there's any other questions from the panel. Maybe not. Counsel, I do have one quick one. Absolutely. Your opponent can consider that. What are we going to do? If this was a criminal case and an improper statement came in and there wasn't jeopardy concerns, we would send it back for a new trial. Are you asking us to send it back and have a whole other hearing, or are you asking us to send it back and return the parties to the status they were before? Are you asking us? It seems that Goldstein's is the most favorable testimony to you. Correct. Is that what you're asking for? What is it that you want us to do? I believe the outcome that would be most favorable to me and most preferred by me, obviously, would be going directly back to the allocation judgment. I know that there has been significant time with sending it away from his children, and so I believe the most reasonable outcome would be something along the lines of Dr. Goldstein's step-up plan and to get him back towards his allocated parenting time. In the alternative, obviously, if the court is not inclined to do that, I would be okay with remanding for a new hearing on the matter, but I don't believe necessarily that is required. Thank you. Thank you, counsel. Thank you. Mr. Powers? May it please the court? Good afternoon. Good afternoon. For the record, my name is James Powers, and I'm appearing this afternoon on behalf of Dr. Madhavi Rayali, who is present in the court. I kind of want to go through just a little bit of the preliminary so that you have context, because the questions that you were asking, counsel, related to the context. There was a judgment for dissolution of marriage that was entered way back in March of 2018. At that time, the oldest daughter, Rhea, was still 5 years old. Close to being 6, three months away. Leila, she was 3-1⁄2 years old. Now we have Rhea, who's going to graduate from eighth grade, and we have Leila, who's in fifth grade. She's a little over two years. She has a late September birthday, so that's why she's another year behind in class. The allocation judgment had been split in time, where Dr. Rayali would get four days per week during the school year, and Dr. Singel would get three days. And during the summer, they'd do more of a 50-50. When the issues first started that were brought in the court, and it was noted by the trial judge, was in July of 2021. That was the petition that was filed by Dr. Rayali, claiming that Dr. Singel, in front of the children, was enraged, screaming at the children, punched the wall, broke the light switch, that the children were terrified and trembling. They had contacted Dr. Rayali, that this was not an offset or just one odd event. What ended up happening there was the July 15, 2021 court order, which is in the record as C-209, which required, and it was by agreement, Dr. Singel to attend a minimum of 14 therapy sessions with Gwen Waldman at his own cost, and to be responsible for 50% of Dr. Rayali's fees. The recent court incidents or appearances started in September of 2022 with the petition for order of protection. It was withdrawn in April of 2023, and I'll get to that. These included the incident with the light switch, screaming and yelling and using profanity against children, which he's admitted to, Dr. Singel, during trial, and admitted to that it occurred during the pendency of these post-judgment proceedings. We have the May of 2022 incident of the minor child, Rhea, trying to jump out of the auto being driven to parenting time by the nanny. We have the July 2022 incident, and these are referred to by Judge McCluskey, too, in his decision, where Dr. Rayali having the children in the car yelling, punching the, or Dr. Singel yelling, punching the steering wheel, using the F word, that the youngest daughter, Lila, urinated on herself in the car from fear. And then we have the final incident on 8-31-22, when the nanny was taking the minor child's children to parenting time with Dr. Singel, that Rhea would not get in the car, would not go, was threatening suicide, was threatening self-harm. The emergency order of protection was entered, and it was continued throughout until April. And what happened between them is in the fall, Dr. Goldstein was appointed. And Dr. Goldstein did, and I put the findings in my brief, regarding finding that Dr. Singel had anger issues, that he did not understand or was not comprehending how these adversely affected his children. He also stated, and there's something that J.L. stated repeatedly, that none of these issues, as far as Dr. Singel's relationship with his children, have anything to do with any actions by Dr. Rayali, despite the fact that that's what's been Dr. Singel's allegations throughout this proceeding, that she does not alienate their affection. In fact, the GAL put in their initial report she does everything within her power to support Dr. Singel's relationship with these children and to ensure that these children have parenting time with their dad. She does everything short of physically picking up and forcing the children. And there was testimony by Dr. Rayali during the trial regarding having the daughter grabbing on to the guardrail or on the stairs for having to physically pull her up. She's in eighth grade now. Dr. Rayali's here. You can see her size. She testified, I can't physically do it anymore. She's a lot bigger than me. So what did the court do? Initially, Dr. Goldstein in the fall of 2022. Dr. Goldstein gave his report on February 21st of 2023. But prior to that, on February 6th, the trial court appointed a GAL, an eyes and ears of the court, to report to the court. And told this GAL on their second court appearance, there's going to be a step-up program. You're going to report to me. How's it going? What should I do? Should I continue? Is this what's best for the children? So we get to June of 2023. And the GAL is recommending this needs to go slower. So the court appointed Maureen Camelot as a reunification therapist. So that not only would Dr. Singla have parenting time for this limited period of hours each week, but he'd also see the children in a therapeutic setting with Dr. Maureen Camelot. Now, let's go through all this. None of, no one has ever recommended, out of all these professionals, of going back to the old 50-50 time. And that's what they requested in their brief. That we go back and that they make up parenting time. No one has recommended it. Even Dr. Goldstein in his report stated, if we can accomplish this step-up, and that's what they do, they get the children to make sure they're safe. Program that we'd go back to, or we would go to, Okay, so let's look in this appeal. What's the standard of proof? It's manifest way to the evidence. The court should view the evidence in light most favorable to the appellate. Where the evidence permits multiple reasonable inferences, the reviewing court will accept those that support the court orders. And the court's custody determination is afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses in determining what is in the best interest of the minor children. And the appellate court shall reaffirm any trial court's ruling if there's any basis to support the trial court's finding, which was a question that you asked, Mr., my opposing counsel. Now, if you look at this, in the record, in the decision, the judge specifically fined Judge Wiskoski that Dr. Singel is not a credible witness. He also found specifically that Dr. Riali, my client, is a credible witness and that the GAL is a credible witness. Let's go to this, what they continue to call improper recordings. In violation, there's three issues they brought with that. First, they say the GAL improperly referred to it. Second, they say that the court erred in relying upon that report. Did the court rely on it? No, the court did not. The court specifically found on page C500, the taping of the conversation between Sunit and his oldest daughter Ria by speakerphone at the residence of Motivey. While Motivey was present, did not violate Sunit's expectation of privacy, period. Isn't that a different thing that I asked you, counsel? I'll let you finish, but if we're talking about expectation of privacy, then isn't he justifying the use of it? No, the next sentence he says, further the court did not consider that conversation in rendering its judgment. And to be honest with you, he's talking about the GAL. This was in August 2024. The GAL reports, the initial one was on February 21 of 2024, prior to this trial starting in March of 2024. The first updated report came in May of 2024 because the trial was not completed and we had more trial dates in May. That first updated report was when the GAL recommended a termination of all parenting time for doctors single. And the reason being, and she put in the report that the reunification therapist had terminated reunification therapy, stating the decision is made in an effort to protect the children and, quote, allow them to detoxify, close quote. That the reunification therapist stated she was unable to make progress and, quote, the children may need to have no contact with Sunit until they are older and able to process what they have experienced. And in this report, reunification therapist refers to an incident that occurred at the reunification therapy one of the sessions in April when she stopped it, saying I need to protect these children. If you read that report, both of the children's counselors, who they'd both been in counseling for years, had both, per the GAL, have reported that the children having parenting time with Dr. Singlet seriously endangers the children. Their mental health, their psychological health. These are in the reports. They're all very simple. So first off, we have the court saying, hey, specifically, I did not consider this conversation a rendering my judgment. Counsel says, well, you shouldn't believe him. I don't know. Next, counsel states, this is the reason for the GAL's recommendations. And it isn't because the recommendations of terminating came three months prior to this conversation. And that was only because we didn't finish the trial in May. We had dates in August that were continued, and they were continued out to October and November. So the trial didn't get completed. When you review all these reports from the GAL, what you see is that Dr. Singlet doesn't want to be accountable for his actions. He doesn't want to recognize what the issue is and that the issue is him. Because the first thing you have to do if you're going to have behavior change is recognition of the problem and then the change. And that's what the GAL is saying that he doesn't do. He wants to blame moderate. And that's where we get to on the contempt finding, which was – I'll get back to issue one, which was the one. But on the contempt finding, when I questioned the GAL, she, in her first report, stated, Modaby, quote, continues to do everything in her power to facilitate parenting time in a relationship sooner than the children. Here's another quote. Modaby does everything short of physically forcing the children into a vehicle. In her testimony in the record, 350, R350, the GAL testified there has been no alienation of affection. The children's refusal to see soon is not based upon any actions by Modaby. The GAL testified that the children's therapist, the reunification therapist, advised Modaby to not force the children to go for parenting time. These are in relation to the petition for rule to show cause that Modaby held in contempt of court. And that she should follow these recommendations, which she did. The court found all that to be reasonable. Remember, this is beginning in May of – or April of – April 10th of 2024. All reunification therapy stopped completely because the reunification therapist is saying this is not appropriate for the children. These children need to detoxify. And Modaby is not involved in any of that reunification therapy. She's not involved in any of it except for bringing the children. Let's talk about restriction of parenting time. Section 60310 of the Illinois Marriage and Dissolution of Marriage Act. Cases have stated repeatedly it's a two-pronged test here. The first prong is we must find that the person's contact with their child seriously endangers the child's physical, mental, moral, or emotional health. Once you do that, you get to your second prong if you have that finding. And that is what do we do? The statute allows for the court to restrict the parenting time, to terminate the parenting time. It has everything. And at the end of it – And it's been terminated for 22 months. Well – There's been no parenting time for 22 months at this point. Well, we've had statuses before the court. And the court is – because the decision was stating follow the recommendations of the guardian ad litem. And that was for there to be conversations and conferences between the J.L., between Sunit's therapist, and between the children's therapist to move this forward. Sunit unilaterally terminated the unification therapy, saying you're not needed anymore. You're biased against me. I don't want you on this case. So he's done nothing. So it's your position that that's because he has chosen not to follow the plan, so to speak? Correct. We've been in court. And even the last time we were in court, which was less than a month ago, Judge McCluskey said, where are you going with this? What are we doing here? And the reunification therapist reporting that I tried to contact Dr. Singler's therapist in July. It's on the record down there. No contact back. Finally, in October, I got contact back, and I was told, put everything that you want for me in writing. I did that in October. In October. I didn't get a response until late December. This was when we were in the first week, I think, of December of this year. But I need there to be communication between the therapists. And it needs to be cooperative. In fact, if you look at the report, the GAL will tell you, and the May 10th report, and the October report, that the children's therapist is saying they have attempted to have Dr. Sundar Singler take part in the therapy, and he's hindered that. He showed up maybe one time. He won't. They've tried to have contact with Dr. Singler's therapist to talk to him about what needs to be done to make these children feel comfortable. And any time Ms. Bernhardt was put in the May 10th report, has contacted his therapist, that Dr. Singler's been the one calling her back saying, nah, he's not going to speak to you. So what has he been doing? Are all the professionals wrong here? And that's what I keep saying. I don't come to my job looking to terminate anyone's parenting rights or their parenting time. I don't think Judge McCluskey does. We have all these professionals, the GAL, reunification therapists, the Children's Institute therapists. None of them have any where there's any link to either of them, any of them. None of us. But everyone's coming to the same conclusion in dealing with these children, and the issue is that the children have grown older. And the children are now able to voice their thoughts and what they believe. I mean, if you look at Michelle Bernhardt in the second of the May 2024. Counsel, your time is up if you want to pull it together. Sure, Judge. Thank you. Just based upon all the evidence, no matter what this court would rule on eavesdropping statute and this, it would, it has plenty of evidence, a plethora of evidence to affirm the trial court's ruling. The second issue as it relates to the eavesdropping statute is the court did not, for the 8th August 2024, even rely upon that tape. So that would not be grounds to overturn this. As it relates to the 2015 and 16 tape, the only referral into the decision is on C-498 under Sunit Singley. He stated, during the trial, a tape recording of Sunit yelling and swearing was played in court. Sunit yelled at the top of his lungs, fucking bitch, fuck you. That's it. And that statement under the fact section of what evidence was heard, and the judge denied admission of that tape into evidence. Nowhere else is it even referred to in the court's decision. I would ask the court to affirm the trial court's decision. There may be some questions, Counsel. I have one. Sure. As it relates to the unilateral or arguably unilateral decision to change schools, understanding from the record that there was a request made by your client to consider the change, that there was an immediate, somewhat immediate response that he would look at it and then silence it. Is that the justification? Yeah, well, I believe so in this context. At the end of June, it was re-up. And this was recommended, by the way, that the child attend this school, which the child's not going to after this year. She had two years at this special school. It's worked very well so she can go back to her school. And part of it was Lela was in the advanced program, and she had gone down to, and they said because of the stress and anxiety she had, to having a 504 plan, an educational plan at school. So it was something the GAO recommended in June, provided notice to Dr. Sunit. Was there any court permission for her to change the schools unilaterally? She did. He didn't file a rule to show cause because he didn't really respond for over a month until right before enrollment was due because he didn't respond to the end of July, and enrollment was due then. And he wanted, if you look at the record, he wanted Lela. You're not quite answering my question. I understand that he is the less that he dragged his feet, but did the court ever say go ahead and enroll these kids? Yes, in the final decision, the judge said it's fine. Thank you. Thanks. Thank you, Counsel. Appreciate it. Mr. Madden, you have five minutes to rebuttal. Once again, John Madden, I believe the court accurately assessed the situation with regard to the school issue until the court raised the issue after his time was expired. He didn't even touch on it. It is pretty plain and simple. He was not allowed, she was not allowed to change the child's school, and she did it, to the point that they said he dragged his feet. They asked it on the 25th of June. He responded on the 27th of June. With regard to some of the claims made by opposing counsel, that Maddie was doing everything she could to facilitate parenting time, the GAL's basis for that was Maddie had told me that's what she does. When asked directly at court, there was a question of whether or not she did positive reinforcement. She said yes, and we asked if that worked, and she said yes. And we asked if she was still doing it, and she said no, I stopped her. So she had plenty of tools in the toolbox that she simply was not willing to use. With regard to the parties utilizing Gwen Waldman in 2021, both parents went to a meeting with Gwen Waldman that was done by agreement. It was not some punishment for Sunit. It was related to issues between the parties in co-parenting. It was not some sign that he is a danger to these children. On his point that all of these medical professionals agree that Sunit is some danger to his children, that's simply incorrect. There was only one medical professional who actually interviewed Dr. Singla, and that was Dr. Goldstein, who did not find that either parent was a danger to his children. He noted some issues with both parties. He said Sunit has some anger issues. He said Madhavi seems to interpret everything as an attack on her, and she seems to convey that to the children. Like there are issues that the parties should be working through. I'm sorry to interrupt, General Butler, but 22 months is a disturbing amount of time for a parent not to see their children. Is it your client's refusal, and I'm talking about indirectly, is it your client's refusal to follow the direction of the court that's preventing him from seeing his children? No. The big point they constantly raised was the way to see your children is you have to get independent behavioral therapy. He has been seeing Dr. Memon since before that trial concluded. He has never interfered with the ability of Dr. Camelot, who terminated the reunification therapy. Dr. Singleton did not terminate the reunification therapy. He has never interfered with DGL's ability to communicate with Dr. Memon. Who's that? What's that? Who's an acronym? Sunit has never interfered with anyone's ability to contact his therapist. He is more than willing to have his therapist work directly with the children's therapist or the reunification therapist or anything that's necessary to get this matter moving. He is the one who has been pushing this matter to get it moving. He wants his parenting time back, and he's willing to go through the steps to get it back, but no one is seemingly taking the steps to get him there. I mean, between April of 2024 and December of 2024, there was no order saying he would not get parenting time. The order said that he was supposed to have Saturdays and Sundays, and they simply stopped providing the children for him to have that parenting time. A lot of the allegations raised by opposing counsel are facts where Dr. Reality was not present. She claims that Sunit was screaming at these children, and he slammed this light switch. She wasn't present for that incident. Dr. Singleton was there. A light switch broke when he pressed it. That was what happened. There is no big smoking gun here, and if there was, it would have been raised by Madhavi in this case. It's a collection of small incidents, often years apart. Should he have raised his voice when he was late and hit his steering wheel? No, he probably shouldn't have. But is that a basis to keep someone away from their child from now 22 months? Absolutely not. He is a good, loving parent. He is a medical doctor. He is a – I believe he teaches at the University of Illinois. He is someone who should be having parenting time with his children on the basis of, well, I don't believe that he referenced these video recordings. In the judge's order, they specifically say, several examples of Sunit's anger towards the children are testified by the GAO. When Rhea declined to attend her grandfather's funeral and Sunit told her, That is a verbatim quote from the audio recordings, and then down below, during the trial tape recordings, Sunit yelling and swearing was played to the court. Sunit yelled at the top of his lungs, Fucking bitch, fuck you. Counselor, your time's up. If you can wrap up, do we have any questions from the panel? I do not. Very briefly, just to wrap up, if the court didn't want those items to be viewed as being considered by the court, he wouldn't have went through the trouble of explicitly writing them into his will. Thank you, Counsel. Thank you. I'd like to thank both parties. We will take this matter under consideration and issue an opinion in due course. Thank you very much. Thank you for your time.